At this time, we will hear Pasternak v. Shrader. Good morning. May it please the court, Mark Elliott, counsel for Plaintiff Appellant Bruce Pasternak. A plain reading of the ERISA statute when applied to this plan... in the plan and how the periodic accumulation of stock is calculated. Are there written rules? Is it automatic? Is it discretionary? And so forth. Yes, thank you, Your Honor. The way the plan worked, it was designed for certain partners at the firm. They were obligated every year to purchase the amount of stock that was offered to them. And then they were mandated, as we'll discuss, to hold on to that stock. That is to say, not sell it until after they had retired or terminated their employment. The amount of stock that they had to buy was a discretionary judgment made by the firm? The amount of the award was discretionary. Now, the word discretion is important, Your Honor, in this sense. It applies to whether or not there was a bonus. And as we'll discuss, there was not a bonus here. And it was awarded, Your Honor, on a lockstep basis. In other words, there was no discretion as to this particular partner had a good year versus this particular partner did not have a good year. No, it was on a lockstep basis. And for that reason, this is not a bonus. Did all partners get it? I beg your pardon, Your Honor. I couldn't hear you. I'm sorry. Did all partners get the stock? Correct. All partners received the stock, and they received it on a lockstep basis, which is why this is not a bonus plan. Okay. Thank you. I understand that. Thank you very much, Your Honor. Every partner received the same amount? Is that what you mean by that? By level. By the level. To be more precise, Your Honor, it was by level, but it was not tied to performance. So all partners at a certain level in seniority would have received the same opportunity, which was more than an opportunity they needed to buy, but at the same amount, same award. When you apply the plain reading of the statute to the fact and tense of surrounding circumstances here, reversal is warranted. That record here includes a detailed proposed pleading and a sworn declaration, both of which, on this appeal of a motion to replead, should be accepted as true. And that record shows the following. Your Honor, do you have a question? No, no. That record shows the following. Participants in the plan were, in writing, expressly discouraged from selling their shares while employed. The plan itself contained a severe penalty for selling, Section 10D. If you were to sell one share of stock while employed, you would have lost all rights to purchase any further stock, which was a lucrative benefit because you're purchasing the stock, if you didn't forfeit it, at a significant discount. The Eighth Circuit Emmanager case tells us that a penalty on sales in a stock plan is an important factor militating in favor of a finding of a pension plan. I should also add that the Department of Labor, the department charged with administrating this program or the ERISA program, has held or opined that discouragement in and of itself can militate in favor of a pension plan. But most importantly, the third factor I want to discuss, and it's something that the Court below completely ignored and respectfully the defendants have studiously avoided, is this. The plan participants were told orally, do not sell. If you sell, there will be negative and severe repercussions for your career, including bad reviews and termination. This is in our proposed pleading, and it's sworn to by Dr. Rich, Mr. Pasternak's former client. Excuse me, colleague, Your Honor. If that is determinative, then whether this is an ERISA plan could oscillate between company policies, not according to the plan, but one year someone says, we discourage you from selling. Another management group comes in a couple years later and says, it's okay to sell. Maybe you really ought to sell. So in that sense, that kind of surrounding circumstance that you're talking about is not structural in the plan. And that makes you kind of nervous because an ERISA plan either is an ERISA plan or it isn't an ERISA plan. Well, Your Honor, I respectfully disagree with that because it is set forth in the plan. First of all, the discouragement is in writing in the 1990 proposal. No, I understand. You cited Section 10D. And that's a penalty, yes. I understand that. But now you're going on and now you're saying that verbal advice, which can change over time and is not structural in the plan itself, can constitute surrounding circumstances. If that's so, then nobody will know whether they have an ERISA plan or not, and that's very dangerous. As pled here and sworn to, there was no deviation. There was no oscillation here. And the statute asks us to look at not only the surrounding circumstances but what they result in. But we're trying to apply principles of ERISA law and not just implement this plan. Of course, Your Honor. But what the statute says is that we should look at whether the surrounding circumstances and the plan terms resulted in a deferral of income. No, it's not the surrounding circumstances and the plan terms. It's the express terms. Or as a result of surrounding circumstances, such plan results in a deferral. So, in other words, I think the focus has got to be on the plan. I mean, you make an argument that 10D is part of the plan, and it says if you sell one share, you're heavily penalized. I understand that argument. But now you're going on and you're saying that something that can change and is not really part of the plan is going to determine whether this is an ERISA plan or not. Your Honor, I respectfully submit that what your concern is is actually addressed by the language of the statute because it says the express terms, that is to say the written plan, or the surrounding circumstances. So, yes, surrounding circumstances are something that may be different from the express language of the plan. Now, we submit the plan, including the penalty itself, gives rise to results in, rather, deferral of income. Surrounding circumstances is in the alternative to express terms. So an express term would be one that says this income is deferred. That would be express. But surrounding circumstances would mean you look at the whole plan, including presumably Section 10D, and see whether the mechanism created by the plan is one that even though it doesn't expressly say that it's a pension, it doesn't expressly say that things are deferred until retirement, that the plan operates in that way, results in that. May I respond to that? No, please. There is nothing in the case law. I'm not arguing. Of course, Your Honor. There's a statement that's designed to elicit a response there. And I will. There is nothing in the case law, in fact, to the contrary, to suggest that surrounding circumstances are limited to the actual plan language. In fact, I'd submit the way the statute is structured, it would suggest that surrounding circumstances can include not only the penalty and the expressed discouragement in the plan, but the oral discouragement, which we have pled and sworn to, was consistent throughout. And those oral statements, for example, last comment I know, I'm over time. Go ahead. The statute also provides this, which is, I think, pertinent to what Your Honor is driving at. In section 1002.2b, it provides that if an entity, an employer, tries to evade the statute, there can be a finding that there's a pension plan. What you cannot do, Your Honor, is say one thing in the plan and then, in a sense, behind closed doors, say something else. That would be an evasion of the statute. I believe that oral admonitions backed with teeth are part of the surrounding circumstances. If they contend or you conclude otherwise, then they have a different problem. Then those oral threats, those oral admonitions would be an evasion of the statute, which again would warrant a finding of a pension plan. Let me ask you this. Is your client appealing the ruling that rejected the filing of an amended complaint discerning securities fraud claims? No, he is not. That's my impression. That's for Mr. English, who goes next. That's my impression. Thank you, Your Honor. Thank you, Your Honor. May it please the Court, Michael English, counsel for Appellants Kucerich and Boudinot. I did not represent the appellants below. We join in Mr. Elliott's ERISA-based arguments, but Mr. Kucerich also appeals the district court's denial of leave to amend the consolidated complaint. Is Mr. Boudinot? He does not, Your Honor. Notably, this was the first time Mr. Kucerich asked the district court for leave to amend, and this was timely made. It was made less than one week from Judge Kaplan's grant in part of Mr. Kucerich's motion for reconsideration with respect to the motion to dismiss. In denying leave, the district court violated Rule 15's plain mandate that leave to amend should be freely granted when justice so requires. Obviously, we don't have a seventh or an eighth amended complaint here because the alignment of parties was rejiggered and reorganized. On the other hand, there have been repeated opportunities over a period of years for this issue to be raised. Your Honor, you're going to the reasons, the undue delay, and the prejudice. The issues, and this was explained to Judge Kaplan, the securities claim didn't crystallize until the fall of 2010. The information circular, the falsities are alleged, took place in May 2008. After Carlisle bought it, they IPO'd in the fall of 2010, and the CEO, same CEO who'd given 11% revenue projections to the so-called fairness expert in 2008, now said 20% revenue growth since the deal, 20% year one, 18.5% year two, that was a result of careful planning. In other words, these are the projections that he expected. That issue crystallized after the consolidated complaint was filed in September of 2010. Kucerich, in short, Your Honor, didn't know about some of the misrepresentations and didn't know about the evidence of those misrepresentations at the time of the consolidated complaint. Your Honor, I'm going to jump ahead to prejudice because it's very clear that uncharacteristically, Judge Kaplan ignored this court's precedent with respect to prejudice. He found the prejudice here was a result of attorney's fees that the appellees had expended in filing the motion to dismiss. We don't recognize that. That's the Block case. And this is the problem when a very learned district judge We should recognize that, but we don't. I respectfully disagree that you should, but I agree you don't. Your Honor, it's very clear, based on what I've just explained in terms of the timing, there's no undue delay. It was a week after the motion for reconsideration. And this court's precedent with respect to the prejudice, that Judge Kaplan abused his discretion on the undue prejudice and delay prongs. The other alternative reason that Judge Kaplan denied leave to amend was futility. And I submit he made the same errors, shooting from the hip from the bench, no written opinion, no citations to case law. Very uncharacteristic of this district judge. Judge Kaplan found Mr. Kasturic released his claim, his securities claims, by signing a letter of transmittal in 2008. This was the letter that Booz Allen sent to the shareholders. They signed in order to get the consideration for the merger. They signed on the dotted line and sent it in. Booz Allen buried in the middle of that letter of transmittal release language that plainly, Section 29A of the Securities Exchange Act, said any release, when you try to release your right to bring action under the Securities Act, that's a void. This court, as well, Your Honor, in the Vackled case, has enforced the anti-waiver provision of Section 29A. Now, Judge Kaplan didn't consider 29A. Was it argued to him? At oral argument, counsel below stood up and argued 29A. And Judge Kaplan said, Your Honor, even if you're right, you still lose. Now, appellees go to great lengths to try to avoid Section 29A. They cite a string of Ninth Circuit cases in which a release has been valid in the middle of ongoing litigation between parties represented by counsel waiving future claims. The Ninth Circuit has found that in the context of having representation in the middle of an ongoing litigation with counsel, that that can be sufficient to waive these claims. Mr. Kucurik had counsel. No, Your Honor. Mr. Kucurik. With that $20 million transaction, he didn't have counsel? There's nothing in the record. He filed a lawsuit in New York State Court about a week later with respect to Shadowstock, with respect to something different. That was not a security. Shadowstock is a contract promised to pay. So, yes, I should resubmit that. I think the record is clear. He had counsel a week later. With respect to this, Mr. Kucurik put in several affidavits in the New York State action. The letter of transmittal says, If you don't send this in by July 25th, there's going to be a delay in getting your consideration. Mr. Kucurik, send it right back. The last reason that Judge Kaplan denied leave to amend on futility grounds was under Section 9B. We are left guessing as to what Judge Kaplan's basis was. He simply said, You didn't come close to pleading 9B. Gave no explanation. And I would submit, Your Honors, that you should not conduct a plenary examination of the record on this complaint, whether we satisfy the specificity of 9B, in the absence of any indication from Judge Kaplan as to what wasn't specific. If you do, I submit there's no shortage of the who, what, where, when, the falsities that are alleged, the omissions alleged, in a very robust complaint. The complaint pleads fraud with respect to the valuation of the government contracting division and the business division. In addition, it pleads fraud in connection with the bidding process, the so-called auction process, where despite the fact that strategic bidders were interested, we know from the information circular, an unnamed strategic bidder came in in 2006, that only private equity bidders ended up submitting bids. The economic research is clear, and this is pled in the complaint. Is this concerning the same transaction that underlies the fiduciary duty claim? It does, Your Honor. Well, that you certainly had notice of, didn't you? Long, long before. Whether or not the directors violated their fiduciary duties to retired shareholders, it is based on some of the evidence that was compiled, again, after the consolidated complaint was filed. Well, it's very common after a complaint is filed for evidence to be, additional evidence to be generated. That's what the whole discovery process is about. You don't discover the existence of a claim just because you discover the existence of additional support for it. There was no discovery in this case, Your Honor. I'm not saying discovery. I'm just, you're saying incremental facts were found out over time, and therefore there's nothing untimely about your motion to amend, but certainly you knew all about the sale of the government consulting business and how much money it was and what effect that would have had, what a nice effect it would have had on Mr. Kuceric's, the value of his stock. Your Honor, I suggest these are not incremental facts. These are significant facts that go to the falsity of these statements in 2008 that were developed when Carlisle IPO-ed in the fall of 2010. What is the false statement? I realize I'm... Sure. Multiple false statements, Your Honor. One with respect to the valuation of the government contracting division and the commercial division. The CEO provided to the fairness expert an 11 percent growth estimate. Now, these are government contracts. As the Court knows well... Isn't that the division that was sold? That was sold, yes. And didn't you know fairly promptly how much it was sold for? No, Your Honor. The falsity only came out when in 2010 the same CEO said the 20 percent revenue that actually took place was something that he'd planned for. That directly shows the falsity of the 2008 statement. So it wasn't just good business. It was so he underestimated it at the time it was valued? That's exactly right, Your Honor. By deflating the value of the shares, the retired shareholders didn't get the fair value and only it enriched the core management, including CEO Schrader, throughout the process by taking back the stock at an undervalued price. That's exactly right. Okay. You've reserved a minute to rebuttal. Mr. Elliott has as well. We'll hear you, Mr. Ballinger. Thank you. Thank you, Your Honor. May it please the Court. I'm Scott Ballinger here for the Apo Lee Booz Allen Hamilton. If I may, I'd like to start with the ERISA issues, and I'd like to start by clarifying the answer to Judge Winter's question. The statement that these awards were lockstep or by seniority isn't quite right. The awards were given in the same amount every year to people who held the same level title within the Booz Allen partnership, but it wasn't by seniority. It was by your performance in the firm, how far you advanced. So they had L1 partners, L2 partners up through the lead partner ranks, and then they had senior partners that you could be promoted to. Are you saying it was a bonus rather than a grant to everyone in the same level? It was a discretionary bonus that was given every year. Nobody was promised anything. And when the management fixed the amount of the bonus, they fixed a certain amount for the L1 partners, a certain amount for the L2 partners, a certain amount for the S1 partners, the senior partners, and so on. But my point is simply that your advancement through those ranks was not lockstep by seniority. It was a function of your performance within the firm. Now, it has been settled law for almost four decades now that stock option plans like this one don't trigger ERISA. And if you just march through the statutory criteria, we think that it's clear why. There are two subsections. The first covers plans that provide retirement income to employees. It has been settled since Murphy v. Inexco in 1980 that that section was intended to cover plans whose primary purpose was to provide retirement income and not plans that were designed for other purposes but that just incidentally made some payments after retirement. Otherwise, ERISA would cover everything in the world. ERISA would cover the practice of paying dividends to your shareholders. Your argument is that the purpose of this was to retain experienced personnel so it was an incentive rather than a retirement plan. Exactly, Your Honor. Like many of the decided cases, this was a plan that was structured in order to incentivize some of the most valuable officers of the firm to stay and spend their career at Booz Allen rather than leaving and go somewhere else. Why wouldn't a generous pension plan do exactly the same thing? Why would I leave after 29 years if after 30 I can get a nice pension? Well, sure, Your Honor. If what you are offering to the employees is an incentive to stay in order to get a generous pension after you retire, then that is a retirement plan. This is a stock options plan. It granted stock options. That's all it did. It granted them while the employees were – I'm wrong, but usually you get stock options. You can exercise them based upon certain requirements that don't necessarily entirely correlate with termination of employment. Your Honor, these awards were given during employment. They were exercised during employment, and once you exercise the option and you pay the money, you own the stock. You own it while you are employed. Your adversary pointed out that under Section 10D of the plan, if you sell one share of it, and it's only one buyer, so the company will know if you sold it. If you sell a single share, all your rights to purchase future shares has been erased. That's right, Your Honor. Since this is a very valuable thing, then isn't that a mechanism built into the plan that has the result of causing this thing to be a pension plan? Your Honor, it has the result of discouraging sales to some extent, but it has nothing to do with – To quite an extent, isn't it? Your Honor, it has to do with the other purpose of the plan that I didn't get a chance to talk about, which is maybe what's a little bit unique about this plan, which is the other very important purpose of this plan is to raise all of the equity capital that Booz Allen needed for its business. The participants in this plan were the only shareholders, and all of the equity working capital that Booz Allen needed in its business came from the participants in this plan. Obviously, Booz Allen needed to discourage people from dumping the shares right away because they needed that capital. It has nothing to do – So another purpose of this is to make sure that Booz Allen does not have to rely on loans or a public sale of stock. Exactly, Your Honor. They wanted to be wholly owned by their officers. In many respects, they thought of themselves at this point as a partnership, and they wanted to be wholly owned by their current officers. In order to do that, the officers have to – we're in any partnership people contribute over a period of time because nobody has a big pile of money. They contribute money over time to capital of the enterprise, and when they leave, they take it out again. Exactly, Your Honor. We are bound by the wording of ERISA, and this here says that any plan to the extent that as a result of surrounding circumstances results in a deferral of income for periods extending to the termination of covered employment or beyond is an ERISA plan. Your Honor, the point that – And if it's also a capital-raising plan, if it's also an incentivization plan, I'm not sure this statute has any exceptions. Your Honor, the point that I'm trying to make is that the discouraging people from selling does not necessarily evince a desire to provide retirement income. It is even more consistent with what the announced purposes of what Booz Allen said it was doing, which is to raise capital and incentivize people to stay. What if that is in fact a circumstance, and it is a surrounding circumstance, that does result in deferral of income for periods extending to the termination of covered employment? Okay, well, let's talk about – What if? There's absolutely no deferral of anything here, Your Honor. All that this plan does is grant stock options. That's what it grants. It grants them while you are employed. You have them. You purchase the stock, and then you own it. Along with all of the benefits of stock ownership, including voting rights and a modest dividend, you own the stock. Aren't you required to sell it, though, two years after you leave? Eventually, yes, because Booz Allen's purpose was to be owned by its current officers, and if you're no longer a current officer, you should have to sell. You only sell it back to the company. That's right, but that's not a deferral of income. As the Fifth Circuit recognized in the Tolbert case and the Booz cases, in order for there to be a deferral of income, there has to be a present entitlement to some payment that you elect to defer to some future time. So in the Booz case, for instance, it was AT&T's practice of paying part of the long-distance bill of its retirees, and the Fifth Circuit said, that's not a deferral of income because you had no right to receive it while you were employed. It's just a promise to do something after you retire. So Subsection 2 is not triggered. Now, a plan like that might very well trigger Subsection 1 in some circumstances if it is intended to provide retirement income. It actually, for strange reasons, didn't in that case. And 1 and 2 are in the alternative. That's right, but in this case, Subsection 1 is not triggered because the primary purposes of the plan were not to provide retirement income, and Subsection 2 is not triggered because there is no giving up of something that you were entitled to now in order to get something later. To the contrary, you got everything that you were entitled to. You actually received under this plan while you were employed, and I think there's some important conceptual confusion in this case that can be cleared up if you think about the value represented in these shares in sort of three buckets. So there is the money that the employee pays to Booz Allen for the shares. That's not a benefit under the plan. It's a cost to the employee. It's what they pay for the asset they're getting. Well, the opportunity to buy is a benefit at below market rates if there were a market. So the second aspect of the value that's being conferred here is the discount, right? So most of this stock was purchased at something less than half of book value at the time of purchase. That value represented by the difference between what you pay and what you get is a benefit under this plan, but it's not deferred. It is conferred immediately when you purchase the stock for less than its book value, and the IRS taxes you on that immediately. And then you have this third bucket, which is the prospect of potential future capital gain in the appreciation of that asset if Booz Allen does well and its balance sheet grows and its book value grows. That's not a benefit conferred on a continual basis by the plan. It's just capital appreciation in the capital gain embedded in the asset. Isn't that what all pensions are like? You contribute money and you hope it appreciates in value before you have to draw it down? Isn't it the same? Well, if Your Honor is referring to a traditional 401K where you make contributions. So the reason that that sort of plan is covered by ERISA is because your contributions are on a pre-tax basis, if you will. You designate some portion of your current salary that you are entitled to receive today, and you say, I don't want to receive that today. Put it instead into this deferral vehicle. And at that point, it's covered by ERISA. It doesn't matter whether they put the money in a stock or they buy stock with it or anything. What about the portion that the employer contributes to the same kind of plan? I think that is not relevant to the implementation of ERISA. That is a – it is the employee's deferral of the amount that he is currently entitled to that triggers subsection 2. But there's typically another portion, not in 401Ks, but in traditional pension plans, where the employee contributes a portion and the employer contributes a portion. Well, Your Honor, in a traditional defined benefit pension plan, of course ERISA applies because subsection 1 applies. That sort of plan is obviously designed to provide retirement income. That's its entire purpose. But the case law has uniformly for 40 years recognized that stock option grants do not trigger ERISA, in part because what the Fifth Circuit said in Murphy very wisely was Congress wrote the coverage provision of ERISA to line up with the problems that Congress was trying to solve substantively with the ERISA statute. What Congress was worried about in ERISA was the underfunding or mismanagement of funds accumulated to finance future employee benefits. Congress's concern was that employers weren't putting away enough money or that the funds were being mismanaged by fiduciaries. A stock option plan doesn't involve any of those dangers. Doesn't the usual stock option plan result in your having the option to buy stock at a certain point and you buy it and it has nothing to do with whether you're leaving the company? That's right, Your Honor, but that's true here too. You got stock options from Booz Allen, you bought the stock, and you own it. You are then one of the only voting shareholders. But you can't sell it. You can't sell it because it was a privately held company and there's no market other than the company. You could sell it. The plan explicitly says you can sell it any time. There were some consequences attached to that because of the purposes of the plan, one of its purposes. Section 10B, which your adversary referred to, says if you sell a single share, all your rights to purchase the future shares ends. That's right, Your Honor, consistent with the plan's purpose of raising capital for the firm, not retirement income. Isn't that kind of a circumstance? Isn't that a surrounding circumstance? It's a surrounding circumstance. Wouldn't it result in deferral of income? Oh, I see. You're saying it's not income. Wouldn't it result in the deferral of the sale of the stock until termination? Forget the word income. It results in the employee's decision to defer sale of the stock, yes, Your Honor, but that's not a deferral of income within the meaning of the statute. We're getting down to the issue of whether this is income that is deferred until termination. Exactly, and it's capital gain, and it's not deferred. You own the asset. The Fifth Circuit in Murphy v. Inexco almost 40 years ago now pointed out that if you pay a bonus with property, the fact that that property generates future gain for the recipient doesn't mean that any aspect of the bonus has been deferred. It's just an inherent attribute, in the Fifth Circuit's words, of the property that was used to pay the bonus. If I give you a bonus in the form of a sports car and it appreciates and you later sell it, that's capital gain that you experienced, but it's not a benefit under this plan. This plan works exactly like all of the stock option plans that Your Honor is referring to. You buy the stock, and then you own it, and you have all of the advantages of stock ownership. This stock plan had a feature of requiring you to sell two years after departure from the firm, which is not traditional. And while I'm asking you about that, why don't you comment on the argument made by both opposing counsel that Booz Allen intentionally misvalued the two portions of the firm? Okay, well, so the requirement that you had to sell after retirement is not an uncommon feature of this sort of a plan in privately held companies. It was true also in, I believe, the Hahn case and the Oatway case that are cited in the briefs, both of which held that ERISA doesn't apply. That's not motivated by a desire to provide retirement income to anyone. It was motivated by Booz Allen's desire to be owned by its current officers. They wouldn't sell stock to the public. The only people who could own shares were the people who were currently officers of the firm. So if you're no longer an officer of the firm, you have to sell. It has absolutely nothing to do with retirement. And as to the second half of Your Honor's question, I think it's jumping forward to Mr. Kucerec's claims, his securities fraud claims. And I'll address Your Honor's question, but I just want to bracket first that there are an awful lot of failures in that claim before you get to the merits. It's untimely. It's barred by the release. It's barred by a lot of other things. But on the merits, there's no sufficient allegation in this complaint, sufficient to survive the stringent requirements of the Securities Litigation Reform Act. Is that why the district judge didn't explain why he was tossing it out on 9, on Rule 9? Well, this is a PSLRA case, Your Honor. On its face, it's defective? Is that what you're claiming? Judge Kaplan is a very experienced judge. He's seen a lot of securities complaints. And he recognized that under the Reform Act, which imposes higher requirements in some respects, that this was insufficient. It's insufficient because it's a classic pleading of fraud by hindsight. They have this one quote that they take out of context where they say that Dr. Schrader said later that the company's performance after the sale was the result of planning. What Dr. Schrader obviously was saying was that Booz Halen's continued success over the years was the result of careful planning and management of the enterprise. It's not a confession that he knew in advance that the company was undervalued. And why in the world would these people sell their own company for less than it was worth? It's a classic example of looking at a good outcome. They had a good two years. Their revenue grew. And we have a disgruntled shareholder who sold two years earlier and then wishes that that were fraud. That's never been sufficient. But, Your Honor, I can't imagine that Your Honor wants to reach the merits of that issue. Can I continue a little bit? And I appreciate this is all about an amended third complaint, I think. It is. So as to Mr. Kucerec's arguments, the decision tree here can get very complicated. I think the simplest path to resolution of those claims starts with the release that he signed and the race judicata consequences of his loss in state court. But a release that releases any future securities claims one may have is suspect. It is suspect. It's one thing to assert a securities claim, know you have it, value it, and settle it. It's something else. Congress doesn't want people to just say you can defraud me. That's fine. The leading cases on this, Your Honor, including the Loca France case from this court, but more recently the Ninth Circuit cases, the Facebook case, and the PetroVentures case, recognize that sophisticated parties represented by counsel in a litigation context can waive securities claims relating to PetroVentures. This was not a litigation context. Your Honor, he had already sent a letter threatening litigation to Booz Allen. He had retained counsel, litigation counsel. He wasn't represented by counsel as to the transaction, but he had retained litigation counsel. He had threatened litigation, and five days later he sued Booz Allen. It was obviously in a litigation context. And when he turned over, signed that release to get his money faster in exchange for $22 million, it was very clear that he knew he was settling securities claims, known and unknown. $22 million is a lot of money, but if he was entitled to a lot more than that, then it's not so much. And so the fact that even whether it was a peppercorn or $22 million doesn't really signify if what he was releasing was his right to assert unknown securities claims in the future. And the leading cases on this say that as to past conduct, you can release securities claims known and unknown if you're a sophisticated party with counsel in a litigation context. We think that that is true here. Regardless, Judge Kaplan did not abuse his discretion in finding this application for leave to amend untimely. All that they want to talk about is prejudice, but what Judge Kaplan said was undue delay. And the law on this, Foman v. Davis from the Supreme Court and this Court's cases too, is that although leave to amend is freely granted as justice requires, it can be denied on the basis of undue delay, dilatory motive, bad faith, undue prejudice, or futility. And here we have at least undue delay, bad faith, and dilatory motive. It's not just dilatory, Your Honor. It was deliberate. He actually pled securities fraud claims in his first complaint in this case, and then he dropped them. When Judge Kaplan asked for a consolidated complaint, he dropped them in order to wrap those allegations. Were they the same allegations? Yeah, they were very similar allegations that he reframed as a RICO claim in order to pursue a treble damages claim under RICO. He could have pled it in the alternative, because Your Honor knows that RICO claims and securities claims are oil and water now after the Reform Act. But he could have pled in the alternative, look, I think this is RICO, but if it's not, it's a securities case. He didn't do that for strategic reasons. Then he pursues that RICO claim to conclusion, and after it has been dismissed, years into the litigation, he says, I want to go back and start over. Judge Kaplan pressed him. I urge Your Honor to read the transcript. Judge Kaplan pressed for what is the explanation for this delay that you want to assert securities claims, which if you look at the proposed amended complaint, the securities claims are just a reframing of the RICO claim that he actually asserted. This notion that he didn't know enough facts to plead his securities claims, of course he did. He just pled them in the consolidated complaint as a RICO claim under a different label. And Judge Kaplan said, what is the justification for this delay, and none was proffered or evident. Judge Kaplan has to have the ability to call foul when a litigant is just blatantly sandbagging the court. Litigation. Thank you. Thank you, Your Honor. I'll hear rebuttal. We got to a key issue, Your Honor, Your Honors, and that is this. When is their income, for ERISA purposes, this isn't a tax case, when is their income, for purposes of determining when a stock plan is a pension plan? And the law provides the answer and a clear one. The Eighth Circuit in Emmenager, and this is a quote, participants in the program redeemed shares while employed, so there was no deferral in that case, providing present income. The Eighth Circuit equates redemption of shares with income. It goes on in that same decision to use the phrase cash in for purposes of determining when there's income under a stock plan. Let me ask you this. I mean, how do we rule for you in this case without upending virtually every partnership arrangement among doctors, dentists, accountants, lawyers, and everybody else? Nothing is more common than that you become a member of a group or partnership and you contribute capital, usually over time because nobody has a big pot of money to put in, and then at the end of it, you cash out. Your Honor, our facts are sui generis as far as we can tell, and it's also a case of first impression. But they fit that mold. And you have a company that doesn't have debt. This is pretty evidently how they raise capital. And my question to you is how do we rule for you without upending all these arrangements? Well, first of all, you wouldn't be at this point we're asking for leave to replieve. We still have a road ahead of us. Secondly, there are — I understand that, but, I mean, let's — I mean, we're here. And their doom and gloom scenario is frankly just ipsy dixit. Your Honor, with all due respect to what they've been saying, none of that is in this record. But let me go on. We do have unique circumstances, including the oral threats. Not every plan has a penalty. Not every plan has an express discouragement of sales. And I didn't have the chance to mention before, we have two — In partnerships, people can't pull their capital out and remain partners. That's not how it's done. Because otherwise, everybody would pull their capital out and say, why don't my other partners, why don't you kick in the capital? If, Your Honor, if this court, rather, were to rule in my favor by finding that there has been a deferral of income because of the penalty and the threats and the like for not selling, here there was 100 percent deferral as pled and as sworn to. You would be consistent with the Eighth Circuit, M. Egger. You'd be consistent with multiple Department of Labor opinions. You'd be consistent with the Hahn decision in Illinois, the Johnson decision and that of the district court. What is more common in a partnership agreement of any kind of partnership than saying that the partners have to kick in capital and leave it there while they wish to be members of the enterprise and then can take it with them when they leave? And that's, you know, everything you're — and in fact, that is a deferral of income because ordinarily people say, well, you're making $75,000, you know, this year. $25,000 has to be kicked in for the capital because we have all of these dental machines and we have all of these offices and carpets and everything else. There is a deferral of income because it goes into the capital of the firm, the enterprise, and then you leave, you pull it out. No case in the land has held that a stock plan cannot be a pension plan. And on the contrary, the Eighth Circuit and M. Egger and Hahn and others have informed us, as well as the Department of Labor, that specifically, Your Honor, regarding stock plans, not some other plans, that if there are prohibitions on sales of stock and that results in a deferral, and here it was 100 percent, which I should add also exempts us if this were a bonus and it's not, then you have a pension plan. You're drawing the distinction on the basis of the fact that it's stock. But this ERISA wording doesn't talk about stock. It talks about whether there's a plan that its surrounding circumstances results in a deferral of income to periods leading up to termination. And you're saying, well, this is not an ordinary partnership arrangement because it involves stock. But what I just read you doesn't have anything to do with stock. What I'm saying, Your Honor, is that the cases and the authority is clear that the fact that it's a stock plan doesn't mean it can't be a pension plan. And, in fact, the Eighth Circuit and others say that it certainly can be. Absolutely. And it can be if there's a deferral of income. And the deferral of income is by virtue of the penalty, by virtue of discouragement in writing, and by discouragement orally that says thou shalt not sell. And, Your Honor, if I could, I want to follow up on your question from earlier, if I could. Don't worry about the red light. Your Honor asked earlier, when I listed the three factors that cause 100 percent deferral here, and Your Honor asked a question about whether or not oral statements as opposed to something in the plan or otherwise in writing could upend things. The Department of Labor, this is on page 41 of our brief, the Department of Labor in three different opinions has said this, and I beg your indulgence, a stock purchase plan that was not by its express terms subject to ERISA could be considered an ERISA pension plan, and here's the quote, if an employer or any person acting directly or indirectly in the interest of the employer prevents or discourages participants from selling their shares. That's three Department of Labor opinions interpreting surrounding circumstances tell us that an oral admonition against stock sales is indeed a surrounding circumstance to be taken into account. You just read that. Now, would you kindly explain to me why that the Department of Labor interpretation would not potentially result in a plan becoming an ERISA plan on Monday and a non-ERISA plan on Tuesday? That's not the circumstances here. I understand that, but we're not dealing with just one case here. We're construing ERISA, and you're saying that if somebody in a position of authority says don't sell these shares, the thing has become an ERISA plan, and if the policy of the company changed and the plan remained on its face precisely the same, you're saying that according to the Department of Labor, it would oscillate between being an ERISA plan and not being an ERISA plan. Let me draw a line that would end the slippery slope that Your Honor is concerned with. Yes. Here, you have a plan that has an express and severe penalty for selling early. You're talking about 10D. 10D. Here, you also have in writing, so it's not a question of who said what in the hallway, you have an express discouragement in writing. So here, the oral admonitions should be taken in the context of you have the employer implementing, making very clear to its employees that we mean business. When we said we expect that you hold those oral statements, Your Honor, we mean business, and don't you forget the penalty. So where you can draw the line is we're not relying just on the oral statements. Those oral statements back up and are consistent with and highly plausible in light of the penalty and the written discouragement. So there's the line. We're not relying simply on oral statements, but they are awfully powerful surrounding circumstances when added to what's already in the plan. And that draws the line which would end any potential slippery slope, I believe, Your Honor. Thank you very much. Thank you. Your Honor, I want to start with undue delay. Even Judge Kaplan said that this Court has never found undue delay in and of itself sufficient to deny leave to amend. Your Honor asked about the allegations. There were securities fraud allegations in the first complaint by Kucerk. They had to do with misrepresentations made to him to force him to resign. That was his theory at that stage. Remember, he didn't know about the falsehoods, the information circular yet. Totally different. Had to do with his shadow stock. Judge Kaplan implored counsel below, truncate this blunderbuss of a complaint, and counsel did, in fact, do that. He cut those out. The new securities claims are much more well-plaid, Your Honor, and they go to things that we're now hearing about. We're simply taken out of context. I don't think we got a real good answer to Judge Pooler's question about what about this statement. For 15 years, Booz Allen averaged 18 percent revenue growth. All of a sudden, there's a sale. No, we're going to go down to 11 percent. What happens? Twenty percent increase. Where there's smoke, there's fire, Your Honor. If we took it out of context, we should get the opportunity to depose, to get documents, and to further probe these statements that we've alleged with particularity in the complaint. Finally, Your Honors, I'd like to just point to the RICO claims. There was a very comprehensive decision that came out this summer. It's in our reply brief. It's the Menzies decision in the Northern District of Illinois. It went through the 1964 C exception and gave clarity through legislative history that Congress was not intending to stop any type of RICO claims when there happened to be securities fraud as part of the racketeering enterprise, and we'd ask Your Honors to follow the Menzies decision. Thank you. Thank you. Thank you all. We will reserve decision. The case of United States v. Lyons is taken on submission. The case of Warren v. Fishel is taken on submission. That's the last case on calendar. Please adjourn to the court. Mr. Conde. The court is adjourned.